J-S20045-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: G.D., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.D., NATURAL FATHER | : | No. 124 WDA 2019 |

Appeal from the Order Entered December 13, 2018
In the Court of Common Pleas of Blair County
Orphans' Court at No(s):  No. 49A AD 2017

| IN RE: R.S., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.D., NATURAL FATHER | : | No. 125 WDA 2019 |

Appeal from the Order Entered December 13, 2018
In the Court of Common Pleas of Blair County
Orphans' Court at No(s):  49 AD 2017

BEFORE:  GANTMAN, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.E.: **FILED MAY 01, 2019**

Appellant, S.D. ("Father"), appeals from the orders entered in the Blair County Court of Common Pleas, following remand, which reinstated the orders terminating his parental rights to his minor children, G.A.D. and R.S. ("Children").[1]  We affirm.

In its opinions, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

_____

[1] Father properly filed a separate notice of appeal for each child. ***See Commonwealth v. Walker***, ____ Pa. ____, 185 A.3d 969 (2018).

Father raises the following issue for our review:

WHETHER THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION IN DETERMINING THAT CLEAR AND CONVINCING EVIDENCE EXISTED FOR TERMINATING THE PARENTAL RIGHTS OF [FATHER] PURSUANT TO 23 PA.C.S.A. § 2511(B), GIVEN [FATHER'S] RELATIONSHIP WITH HIS CHILDREN [WAS] IMPEDED BY FACTORS OUTSIDE OF HIS CONTROL, SUCH AS HOUSING AND INCARCERATION?

(Father's Brief at 5).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable Timothy M. Sullivan, we conclude Father's issue merits no relief. The trial court opinions comprehensively discuss and properly dispose of the question presented. (*See* Trial Court Opinion, filed December 13, 2018, at 3-13) (incorporating facts and procedural history from Trial Court Opinion, filed March 19, 2018) (finding: Children's guardian *ad litem* ("GAL") confirmed she had adequate time to consult with G.A.D. and he preferred to live permanently with his pre-adoptive parents, which is consistent with G.A.D.'s best interests; GAL established that R.S. was 3 years old and too young to articulate her preferred outcome; Father is currently incarcerated and has had no contact with Children since his incarceration in early 7/17; Father's testimony regarding his attempts to communicate with Children was incredible; Children were placed with pre-adoptive parents when they were about 4 and 2 years old; since that time, pre-adoptive parents have served as Children's sole caregivers and have provided loving, safe, secure, stable environment; Children's primary bond is

- 2 -

with pre-adoptive parents; termination of Father's parental rights was proper under Section 2511(b)).  Accordingly, we affirm on the basis of the trial court opinions.

Orders affirmed.



Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  May 1, 2019

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

IN RE: R.S. a minor ⋮

⋮ 2017 AD 49

⋮

IN RE: G.A.D., a minor ⋮

⋮ 2017 AD 49A

⋮

. . . . . .

HON. TIMOTHY M. SULLIVAN      PRESIDING JUDGE

WILLIAM R. BRENNER, ESQUIRE      COUNSEL FOR BCCYF
RICHARD M. CORCORAN, ESQUIRE     COUNSEL FOR A.M.S., MOTHER
MATTHEW R. DOMBROSKY, ESQUIRE   COUNSEL FOR S.A.D., FATHER
AIMEE L. WILLETT, ESQUIRE       GUARDIAN AD LITEM

## *SUPPLEMENTAL OPINION PURSUANT TO RULE 1925(A) OF THE PA RULES OF APPELLATE PROCEDURE*

### *FACTUAL/PROCEDURAL HISTORY:*

We incorporate the Factual and Procedural History that was set forth in our original Rule 1925(a) Opinion dated March 19, 2018. The Superior Court of Pennsylvania, in a Non-Precedential Decision filed November 9, 2018, vacated (without prejudice) the TPR Decrees entered against the biological parents on February 1, 2018, and remanded the case with instructions. More specifically, the Superior Court directed

1

#18

that Attorney Willett, as the Guardian Ad Litem, shall express **G.A.D.'s** preferred outcome or, whether **G.A.D.** is unable to ascertain his preferred outcome due to his age, development or some other reason. [See *In re T.S.*, 192 A.3d 1080 (Pa. 2018) and *In re T.M.L.M.*, 184 A.3d 585 (Pa. Super. 2018)]. Further, at the time of such hearing, the GAL was to advise the court whether the result of the underlying proceeding is consistent with **G.A.D.'s** legal interest or whether the GAL believes that a new hearing is necessary in order for the child's legal interest to be represented. Finally, the Superior Court directed that we issue a Supplemental Opinion more thoroughly addressing 23 Pa. §2511(b), i.e., the effect of permanently severing the children's parental bond as it pertains to both children.

In response to the Superior Court's directives, we entered an Order on November 13, 2018 scheduling the matter for an additional hearing on December 11, 2018. Attorney William R. Brenner, on behalf of the Agency, Attorney Matthew R. Dombrosky, on behalf of the father, and Attorney Willett all appeared. The biological father, S.A.D. , participated via telephone from the Cambria County Prison. BCCYF caseworker, Dawn Lehman, was also present.[1]

---

[1] The proposed adoptive mother, A.K. was present in the hallway outside of the courtroom with the subject child, **G.A.D.**

2

During the December 11, 2018 hearing, the GAL confirmed that she has been involved in this case since it was transferred from Cambria County in September, 2016. **G.A.D.** is presently 5 years of age and a kindergarten student in the Penn Cambria School District. **G.A.D.** has a diagnosis of Oppositional Deviant Disorder in addition to ADHD (combined type)[2] and sees a psychiatrist who provides medication management. The GAL also advised that **G.A.D.** has additional service providers, including a therapeutic support services person who works with the child approximately 20 hours per week, within the school setting, as well as a counselor, Brian McLeary. [12/11/18 Remand Hearing Transcript, pp. 2-3].

Upon receipt of the Superior Court's remand, the GAL met with **G.A.D.** at the resource family home in Gallitzin on Monday, November 19, 2018. She met with the child for over 1 hour. The GAL indicated that due to his age and mental health diagnosis, it was difficult to get information out of him. **G.A.D.** is able to communicate and he is an articulate young man. During the discussion, **G.A.D.** confirmed that he loves his biological parents, but expressed a preferred outcome to live with    A.K. " permanently. **G.A.D.** stated that he likes living in the resource family's home, that he likes his school, his teacher and being with his sister (**R.S.**). The GAL noted

---

[2] The GAL confirmed the specific diagnosis in an email to the court and counsel.

that during her conversation, it became more difficult to obtain information from him due to his escalating behavior. [12/11/18, T., pp. 4-5].

The GAL met a second time with **G.A.D.** on Wednesday, November 21, 2018 at the office of the child's counselor, Mr. McLeary. When the GAL asked **G.A.D.** to draw a picture of his family, he started with ,.._ M. K. ', his sister "**R.S.**", ' A. K. " and then himself. **G.A.D.** stated that he wants to remain with his resource family permanently, stating once again that he loves his parents, but wants to stay with " A. K. ". [12/11/18, T., p. 5]. The GAL also met briefly with **G.A.D.** prior to our December 11, 2018 hearing, at which time he indicated that "he wants to live with A. K forever". [12/11/18, T., p. 5]. The GAL represented that the child's preferred outcome, based upon her conversations with him, is consistent with what she believes is in his best interest, i.e., to remain with A.K. and M.K and to be adopted by them. [12/11/18, T., pp. 5-6].

The GAL also noted that during the course of the dependency proceeding, from September, 2016 to the present time, she has had a number of opportunities to meet with the subject children. The GAL stated that **G.A.D.** was happy when originally placed with the resource family, as he had prior contact with them and was very familiar with them. [12/11/18, T., p. 6]. The GAL stated that **G.A.D.'s** preferred outcome is consistent with his best interest, i.e., that he wants to be adopted by the resource family. **G.A.D.**

4

has made significant improvement in the stable environment that they offer. The GAL confirmed that she has had adequate time to consult with **G.A.D.** and to assess and state his preferred outcome. The GAL added that there have been numerous occasions when **G.A.D.** has expressed a desire to live permanently with his resource family, which is consistent with the goal of adoption and entry of the TPR Decrees. Based upon her professional assessment, the GAL felt that there was no further need to take testimony from **G.A.D.**, nor any need for any further hearing for the child's legal interest to be represented. [12/11/18, T., pp. 7-8].The GAL confirmed that the younger child, **R.S.**, just turned 3 years of age and is too young to articulate her preferred outcome. [12/11/18, T., p 9].

The GAL, in response to questioning by counsel for the Agency, confirmed that based upon her meetings with **G.A.D.**, as the child's legal counsel, she was specifically advocating his preferred outcome for a termination of parental rights, which is consistent with his legal interest. [12/11/18, T., p. 10].

During questioning by father's counsel, the GAL responded that the counselor, (Mr. McLeary) does not discuss the parents with **G.A.D.** The foster/preadoptive mother established this service after the child's placement. It is the GAL's understanding that **G.A.D.** does not bring up his parents during his counseling sessions with Mr. McLeary. [12/11/18, T., p. 11].

The father, SAD, testified during our December 11, 2018 hearing. He confirmed that he is currently in the Cambria County Prison on a state detainer as a result of new criminal charges being filed. Those criminal charges include a second offense DUI; Possession of a Controlled Substance (Marijuana); and traffic offenses, including Driving Under Suspension- DUI related, 75 Pa. C.S.A. §1543(b). [12/11/18, T., p. 17, 25]. The father acknowledged that he is looking at a mandatory minimum of 90 days, although he indicated that his attorney is in the process of attempting to work out a plea agreement so that he can be placed on electronic monitoring. [12/11/18, T., pp. 25-26].

The father was paroled on July 15, 2018 from the SCI-Laurel Highlands and was living in Hastings, Cambria County, PA with a female friend and her daughter. He was working at Alternative Basement Solutions. [12/11/18, T., pp.17-18]. The father underwent a drug & alcohol evaluation after his release, after which he was recommended for outpatient treatment. He had not yet started such treatment when he was involved in the underlying DUI incident on September 6, 2018. [12/11/18, T., pp. 19, 26-27]. On such date, he was detained by his state parole agent. [12/11/18, T., p. 21]. His maximum date for state supervision for his prior conviction for Retail Theft and Simple Possession is September 15, 2021. The father acknowledged that he does not know what his sentence will be relative to the parole violation. [12/11/18, T., pp. 21-23 & 28].

6

As for the mother, A.M.S, information was provided by the GAL during our hearing that she was incarcerated in late November for allegedly sending drugs into the Blair County Prison. [12/11/18, T., p. 29]. The mother did not file an appeal of the entry of the TPR Decrees.

During our December 11, 2018 hearing, both the GAL and counsel for BCCYF indicated, on-the-record, that they did not see any reason why the court should conduct an "*in-camera*" interview, in the presence of counsel, of the subject child. Attorney Brenner stated that neither the Remand Order nor recent case law requires the child to testify. He felt that the GAL had fulfilled her duties consistent with the Remand Order and that as a result, there was no legal requirement that the child needs to testify. [12/11/18, T., pp. 16-17]. Attorney Willett also opined that there was no need to take testimony from **G.A.D.** [12/11/18, T., p. 8]. The father's counsel requested that we conduct such interview. We declined to interview the subject child for the reasons that we placed on-the-record, which we incorporate herein. [12/11/18, T., pp. 30-31].

Next, we will address **23 Pa. §2511(b)**, as directed by the Superior Court of Pennsylvania in its remand.

## APPLICABLE LAW:

In termination of parental rights action, one major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between a parent and child, with close attention paid to the effect on the child of permanently severing any such bond. Analysis of the emotional bond, if any, between parent and child is a factor to be considered in determining whether termination of parental rights is in child's best interest, even though the statute requiring consideration of developmental, physical, and emotional needs and welfare of the child does not explicitly require a bonding analysis. *In re G.M.S.*, 193 A.3d 395 (Pa. Super. 2018).

While a parent's emotional bond with his child is a major aspect of the child's best interests, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child and deciding whether to terminate parental rights. *Id.*, and *In re A.D.*, 93 A.3d 888 (Pa. Super. 2014).

In addition to examination of parent-child bond, the trial court ruling on termination of parental rights can equally emphasize the safety needs of the child and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parents; the trial court should consider the

8

importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child. *In re G.M.S., supra.*

## DISCUSSION:

In our original Rule 1925(a) Opinion, we set forth in detail the criminal activity the father has been involved in since the children's placement and the various sentences he has served (which we incorporate herein). As set forth above, during our December 11, 2018 hearing, the father is, once again, incarcerated on a state detainer and facing a mandatory minimum of at least 90 days if convicted of a DUI-Second Offense and a §1543(b) violation (Driving Under Suspension – DUI related), not to mention the resentencing that he will face for a parole violation at the time of his Gagnon II Revocation Hearing.

Relative to the father's assertion of the bond that exists between him and the subject children, it is important to note that <u>he has had absolutely no contact with the subject children since his incarceration in early July, 2017</u>. His last contact with the children was approximately 6 months <u>prior</u> to entry of the TPR Decrees on February 1, 2018. For the brief period of time between his release from jail on May 17, 2017 until his re-incarceration in early July, 2017, he saw the children one time at the home of the resource family, and one time by chance. The father claims that he sent the children 5 letters and 2 cards, and that he also sent 2 letters to BCCYF during his periods of

9

incarceration. He also testified as to his attempts to visit the children at the home of the family resource. We specifically found this testimony of the father not to be credible (as set forth in pp. 19-20 of our original Rule 1925(a) Opinion).

A parent's incarceration is relevant to the analysis of parental incapacity and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the "essential parental care, control or subsistence" required. *In re A.D., supra.*

In context of termination of parental rights action, a parent, while incarcerated, is expected to utilize whatever resources are available to him while in prison in order to foster a continuing and close relationship with his children. Incarcerated parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities, and where the parent does not exercise reasonable firmness in declining to yield to obstacles, his parental rights may be forfeited. *In re E.A.P.*, 944 A.2d 79 (Pa. Super. 2008).

Each termination of parental rights case involving incarcerated parent must be analyzed on its own facts, keeping in mind that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what he is supposed to do in prison. *Id.*

10

The evidence also established that the children were placed with the resource family on or about July 6, 2017, at a time when **G.A.D. was just over 4 years of age and R.S. was less than 2 years of age**. Since such time, the resource family has served as the sole caregivers of the subject children and they provide a loving, safe, secure and stable environment.

Other than the father's own testimony, there was no other witness who testified in support of the existence of an emotional bond between the father and the subject children during the dependency proceedings. In our September 25, 2017 Permanency Review Order, wherein the goal was changed to adoption, we made a specific finding that "[b]oth children are doing very well in their (the maternal aunt and uncle/resource family) care and they are an adoptive resource." [9/25/17 Permanency Review Order, #31(e)]. Further, during the TPR Hearing held January 4, 2018, the Agency caseworker, Lesa Ramper, testified as to the emotional issues that **G.A.D.** is suffering and the efforts that have been made by the foster/preadoptive mother to address such issues. The foster/preadoptive mother, A.K., also testified as to how well the children were doing within their home. [pp. 25-26 of original Rule 1925(a) Opinion].

11

Therefore, in consideration of the foregoing, and as set forth in our original Rule 1925(a) Opinion, we accept that the father loves his children and that **G.A.D.** has expressed a reciprocal love. We also find, however, that the emotional bond that the father expresses is not as strong from the perspective of **G.A.D.** We do not find a bond between the father and **R.S.** There is clearly a strong bond between both children and their maternal aunt and uncle, who are the foster/preadoptive parents. The children have been in their sole care and custody for approximately 1 ½ years and they are doing very well and, in fact, thriving within their home. A.K. and M.K. provide the children the love, comfort, security and stability that the children need. Based upon the evidence adduced during the underlying dependency proceedings and at the TPR Hearing, we specifically find that the severing of the parental bond will have no effect as it pertains to R.S. , and very little detrimental effect, if any, as it pertains to **G.A.D.** Any detrimental effect upon **G.A.D.** is substantially outweighed when considering his developmental, physical and emotional needs, as well as his best interests and welfare. We have reached this determination based upon the safety needs of the child as well. The history of this case has established that there is a long history of drug addiction and criminal activity pertaining to both parents, which is still ongoing. As set forth in the Shelter Care Order dated April 11, 2017, the father's own mother, N.D. (the paternal

12

grandmother of the subject children) confirmed that the father was involved with drugs and that the children were at risk in his presence. [pp. 9-10 of original Rule 1925(a) Opinion]. As we set forth in our original Rule 1925(a) Opinion, the father has refused or failed to invest in and successfully complete any recommended drug and alcohol treatment dating back to the August 16, 2016 Permanency Review (6th Month) Order. [pp. 21-22 of original Rule 1925(a) Opinion].

Based upon the foregoing, we enter the Order attached hereto.

Respectfully submitted,

Honorable Timothy M. Sullivan

Dated: December _____ 13 _____, 2018.

13

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

IN RE: R.S. a minor : 

: 2017 AD 49

IN RE: G.A.D., a minor : 

: 2017 AD 49A

. . . . . .

HON. TIMOTHY M. SULLIVAN        PRESIDING JUDGE

WILLIAM R. BRENNER, ESQUIRE     COUNSEL FOR BCCYF
RICHARD M. CORCORAN, ESQUIRE   COUNSEL FOR A.M.S., MOTHER
MATTHEW R. DOMBROSKY, ESQUIRE  COUNSEL FOR S.A.D., FATHER
AIMEE L. WILLETT, ESQUIRE        GUARDIAN AD LITEM

## ORDER

AND NOW, this __13th__ day of December, 2018, based upon our original Rule 1925(a) Opinion dated March 19, 2018, and the foregoing Supplemental Rule 1925(a) Opinion submitted in response to the remand by the Superior Court of Pennsylvania filed November 9, 2018, it is hereby **ORDERED, DIRECTED and DECREED** that we re-enter/re-instate the original TPR Decrees for both children, dated February 1, 2018.

BY THE COURT:

_____
                            J.

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

IN RE: R.S. a minor

:
:
: 356 WDA 2018
: BLAIR COUNTY TRIAL COURT DOCKET
: 2017 AD 49
:
:
:

IN RE: G.A.D., a minor

:
: 357 WDA 2018
: BLAIR COUNTY TRIAL COURT DOCKET
: 2017 AD 49A
:
:
:

. . . . . .

| | |
|---|---|
| HON. TIMOTHY M. SULLIVAN | PRESIDING JUDGE |
| WILLIAM R. BRENNER, ESQUIRE | COUNSEL FOR BCCYF |
| RICHARD M. CORCORAN, ESQUIRE | COUNSEL FOR A.M.S., MOTHER |
| MATTHEW R. DOMBROSKY, ESQUIRE | COUNSEL FOR S.A.D., FATHER |
| AIMEE L. WILLETT, ESQUIRE | GUARDIAN AD LITEM |

## *OPINION PURSUANT TO RULE 1925(A) OF*
## *THE PA RULES OF APPELLATE PROCEDURE*

### *FACTUAL/PROCEDURAL HISTORY:*

The subject children are **R.S.**, a minor female born November , 2015, and **G.A.D.**, a

minor male born June 2013. The biological parents are **A.M.S**, the Mother and **S.A.D.**, the

Father. On December 1, 2017, Blair County Children, Youth & Families (hereinafter BCCYF)

filed a Petition for Involuntary Termination of Parental Rights of both parents. The initial

1

#13

Involuntary TPR Hearing was held January 4, 2018, at which time BCCYF proceeded relative to the TPR Petition filed against the Mother. The Father was incarcerated and was not transported for the hearing. There was a verification placed on the record that Attorney Aimee L. Willett could represent both the best interest and the legal interest of the subject children without conflict. At the outset of the TPR Hearing and at the request of Attorney Brenner on behalf of BCCYF, we incorporated the underlying depending proceedings for both children filed to Blair County Nos. CP-7-DP-126-2016 (for **R.S.**) and CP-7-DP-40-2017 (for **G.A.D.**). During the January 4, 2018 hearing, BCCYF presented the testimony of the caseworker, Lesa Ramper, and the foster mother, [A.K.]. [A.K.] is the maternal great aunt of the children. She and her husband, [M.K.], are an adoptive resource for both children. A subsequent TPR Hearing was held on January 31, 2018 wherein BCCYF pursued its Involuntary TPR Petition against the Father. During the January 31, 2018 hearing, Ms. Ramper again testified. The Father, **S.A.D.**, testified as well.

After the TPR Hearings, we entered a Final Decree on February 1, 2018 granting BCCYF's Petition for Involuntary Termination and terminating the parental rights of both parents for both children. On March 1, 2018, the Father, **S.A.D.**, timely filed a Notice of Appeal, Statement of Fast Track Appeal, Request for Transcripts and a Concise Statement of Errors Complained of on Appeal. In his Concise Statement filed for each appeal, the Father, **S.A.D.**, raises the following issues:

2

1. The trial court erred/abused its discretion in determining Petitioner had established a legal basis through clear and convincing evidence for changing the goal to adoption/terminating Appellant's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(1), (a)(2), (a)(5) and (a)(8), as such a finding is not supported by the record.

2. The trial court erred/abused its discretion by determining that termination of Appellant's parental rights would best serve the developmental, physical, and emotional needs and welfare of the child under 23 Pa. C.S.A. §2511(b), as the Appellant's relationship with his children were impeded by factors outside of his control, such as housing and incarceration, as such a finding is not supported by the record.

### *STANDARD OF REVIEW*:

The trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002)(internal citations omitted).

We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000)(*en banc*). If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191 (Pa. Super. 2004). The termination of parental rights is controlled by statute. *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa. Super. 2006).

We need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004)(*en banc*)(citations omitted).

3

## APPLICABLE LAW:

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child. Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.,* 761 A.2d 1197, 1201 (Pa. Super. 2000)(*en banc*) (citation and quotation marks omitted).

4

**23 Pa. C.S.A. §2511(a) and (b)** read, in relevant portions, as follows:

(a) **General rule.** - - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child . . .

(b) **Other considerations.** -- The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

A two-part test is used for the involuntary termination of parental rights; initially, the focus is on the conduct of the parent, and the party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination, and only if the court determines that the parent's conduct warrants termination does the court engage in the second part of the analysis, a determination of the needs and welfare of the child under the standard of best interests of the child. *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008).

## DISCUSSION:

As set forth above, at the outset of the TPR Hearing held January 4, 2018, we incorporated the underlying dependency proceedings for both children. The dependency history is summarized as follows:

**R.S.**, was adjudicated to be a dependent child in the **Order of Adjudication & Disposition – Child Dependent** entered in the Juvenile Court of Cambria County, Pennsylvania dated **January 15, 2016** by the Honorable President Judge Norman A. Krumenacker, III, after hearing held December 23, 2015. It was directed that paternity testing be conducted to determine the biological father. Subsequently, it was verified that **S.A.D.** was the biological father of **R.S.** Legal and physical custody of **R.S.** was transferred to the maternal grandmother, C.S., with the Mother afforded supervised visitation every other week at the Cambria County CYS Office. After a 3-Month Review Hearing held March 23, 2016, a **Permanency Review Order** was entered **March 30, 2016** finding that the Mother, A.M.S. had been compliant with the Permanency Plan, but that the Father, **S.A.D.**, had not. Legal and physical custody of the child remained

6

with the maternal grandmother, C.S. Visitation for the parents was to be as arranged with the maternal grandmother. The Father was directed to comply with a Home Assessment by Cambria County CYS; maintain a clean, safe and adequately furnished home; undergo a drug and alcohol assessment and comply with all recommendations; submit to random drug screenings; and undergo a psychological evaluation, including but not limited to a parenting skills assessment. Further, the Father was directed to keep all appointments with the psychologist and mental health professionals and follow through with any recommendations resulting from the evaluation.

After the 6th Month Review Hearing held August 19, 2016, a **Permanency Review Order** was entered **August 31, 2016** whereby it was determined that there had been no compliance with the permanency plan by the Mother, however, finding there had been substantial compliance with the permanency plan by the Father, including completing his psychological evaluation, submitting to drug screening, completing a drug and alcohol assessment and participating with the Independent Family Services worker. The Father had failed to follow through, however, with his drug and alcohol assessment recommendations of weekly outpatient counseling and he had failed a drug screen with adult probation. Despite this, legal and physical custody of the child was transferred to the Father. The Father was directed to comply with his Narcotics Anonymous meetings and any and all treatment and recommendations; to continue working with Independent Family Services; to undergo random drug screenings upon verbal

7

request and to undergo a drug and alcohol assessment and fully comply with all recommendations from the assessment.

On September 26, 2016, Cambria County CYS filed a Motion for Change of Venue since the Father was a resident of Altoona, Blair County, PA. An **Order** was entered on **September 27, 2016** granting such Motion and transferring jurisdiction to Blair County.

After transfer of the dependency case to Blair County, Blair County CYF filed a Motion for 11th Month Permanency/Dispositional Review Hearing which was held before a hearing officer, James Adams, Esquire. Upon completion of the 11th Month Review Hearing, a **Permanency Review Order** was entered **November 23, 2016** by Hearing Officer Adams, and adopted as an Order of Court, on December 6, 2016. Attorney Adams found minimal compliance by the Mother and substantial compliance by the Father. The goal was to remain with the parent (Father) with a concurrent goal of adoption. Legal and physical custody remained with the Father and he was directed to continue to cooperate with BCCYF; execute any releases requested; submit to random drug screens and follow through with all recommendations. As to the Mother, she was directed to resolve any pending criminal charges, participate and follow through with any evaluations and/or recommendations made by BCCYF; execute any releases requested and to submit to random drug screens.

8

BCCYF filed a Motion for a 14th Month Permanency/Dispositional Review Hearing and after hearing, a **Permanency Review Order** was entered **February 13, 2017** by Attorney Adams, and adopted by the court. In his Order, Attorney Adams found no compliance with the permanency plan by the Mother and substantial compliance by the Father, however, even though it was acknowledged that the Father was involved in drug and alcohol services, he recently had failed a drug screen. The goal continued to be remain with parent (Father), with a concurrent goal of adoption. Legal and physical custody continued to vest in the Father. At the time of hearing, the Father remained on Suboxone maintenance and after re-evaluation, he was recommended to participate in intensive outpatient services three times per week. The Father declined to follow such recommendations, but stated he would be willing to attend D&A treatment once per week. Due to the Mother's lack of compliance, BCCYF was no longer required to make any reasonable efforts with her.

On April 10, 2017, BCCYF filed both an Application for Emergency Protective Custody and a Shelter Care Application for each child. These Applications were filed after the undersigned gave BCCYF emergency custody with right of placement of both children, **R.S.** and **G.A.D.**, after the Father admitted to actively using methamphetamines; had tested positive for heroin; was found to have drug paraphernalia in his bedroom; and left the family residence with the children. After a Shelter Care Hearing held April 10, 2017, a **Shelter Care Order** was entered **April 11, 2017** whereby the above findings were confirmed. Furthermore, BCCYF had made contact with the paternal grandmother, N.D., with whom the Father and children had been residing. N.D. reported that the Father and the children had been absent from her

9

residence for five (5) days. She indicated that **S.A.D.** could not effectively deal with his drug abuse and that the children were at risk in his presence. Legal and physical custody of both children remained vested in BCCYF and the children were placed into foster care.

After the Adjudicatory/Dispositional Review Hearing held April 17, 2017, **Orders of Adjudication & Disposition-Child Dependent** were entered that same date, finding **R.S.** and **G.A.D.** to be dependent children.

After a 17th Month Permanency/Dispositional Review Hearing held May 17, 2017, a **Permanency Review Order** was entered **May 17, 2017** by Attorney Adams, and adopted as an Order of Court, whereby it was determined that there had been no compliance with the permanency plan by the Father. It was specifically found that the Father had relapsed, had become homeless and then incarcerated, and had not followed through with any recommended drug and alcohol treatment. In his findings, Attorney Adams indicated that the Father was picked upon on a warrant from Clearfield County and was in the process of being transferred to the Cambria County Prison. A bench warrant had been issued due to his failure to appear for numerous appointments scheduled with his probation officer. His underlying charge was a 1st offense DUI. He had also failed to complete several outstanding conditions of his supervision, including drug and alcohol outpatient counseling. Drug screens on January 19, 2017 and March 20, 2017 were confirmed as positive for Heroin. He had been discharged from D&A treatment through the Home Nursing Agency due to non-compliance. His last contact with the children was on April 7, 2017. His mother, N.D., confirmed that she did not want him to remain in her home due to his drug issues. The hearing officer

10

specifically found that the Father's actions in removing the children from N.D.'s home and his attempts to conceal their whereabouts and/or to deny the Agency immediate access "created substantial safety threats" to the children. The current goal became return to parent (Father), with a concurrent goal of adoption. The Father was specifically directed to resolve the issues that led to his incarceration; to cooperate with BCCYF and to follow through with all recommendations, including D&A treatment and drug screens; as well as signing any releases.

After conducting Family Finding, BCCYF ascertained that the maternal great aunt of the subject children and her husband, A.K. and M.K., were willing to be a permanent resource. Thus, upon filing a Motion for Modification of the children's placement, an **Order** was entered **July 6, 2017** placing both children in the kinship foster home of A.K. and M.K., where the children remain to this day.

After a 20th Month Interim Permanency/Dispositional Review Hearing held **August 2, 2017**, a **Permanency Review Order** was entered that same date by Attorney Adams, and adopted as an Order of Court, whereby it was determined that there had been no compliance with the permanency plan by the Father. Legal and physical custody of both children remained vested in BCCYF. The Father was incarcerated in Clearfield County. Prior to or in between his incarceration, the Father failed to appear for any of the five (5) scheduled visits with his children through Path House. The Father remained totally non-compliant with all recommended services.

11

After a 23rd Month Permanency/Dispositional Review/Goal Change Hearing held September 19, 2017 before the court, a **Permanency Review Order** was entered **September 26, 2017** wherein we made the following findings:

> The father is currently incarcerated in the Clearfield County Prison. He was in Clearfield County Prison from 5/15 to 5/17/17. He then was incarcerated in the Cambria County Prison from 5/17 to 6/7/17. He returned to Clearfield County Prison for a week, from 6/7 to 6/14/17, when he was released on bail. The father was arrested on new criminal charges on 7/22/17 and returned to the Clearfield County Prison until 8/21/17, when he was transferred back to Cambria County. He remained at the Cambria County Prison until 8/23/17, when he was moved to the Clearfield County Prison where he remains.
>
> The father had two criminal actions filed against him this year in Clearfield County. At 541 CR 2017, he was charged with Retail Theft, Receiving Stolen Property and Driving Under Suspension. At 683 CR 2107, he was charged with Possession of a Controlled Substance and Use/Possession of Drug Paraphernalia. He is scheduled to be sentenced on 10/17/17, and indicated that he will receive a sentence of 4 months to 2 years, which is technically a state sentence, although the father stated that it will not be a state sentence.
>
> In Cambria County, he was charged with Simple Assault, Flight to Avoid Apprehension/Prosecution and Harassment at 871 CR 2017. At 1328 CR 2017, he was charged with two counts of Possession of a Controlled Substance and Criminal Trespass. He is currently under supervision in Cambria County until February 5, 2019. [Petitioner's Exhibit 1]. The father testified that he will be sentenced in November to serve 6-12 months. He will also have a Gagnon II probation revocation hearing, but claims that his probation officer will recommend inpatient drug and alcohol treatment in lieu of additional jail time. He also was not sure if his Cambria County sentence will be concurrent or consecutive to his Clearfield County Sentence. The father admitted during his testimony that he will be in jail at least 7 months, and perhaps up to a year, after he is sentenced in October.

12

Due to his incarceration, FICS Reunification has suspended its services. The father missed all four visits that were scheduled through the Path House, therefore, Path House closed out. The father had one visit at [Mrs. K's] home, however, there was an incident in front of the children and [Mrs. K] did not feel comfortable arranging for more visits. [Mrs. K] also testified that she is not comfortable with either parent having any contact with the children "unless they are sober". The father has not had any contact with the children since he was most recently incarcerated.

The father has not provided BCCYF any proof that he has engaged in any drug and alcohol treatment or mental health counseling. The father tested positive for heroin on 3/29/17. In July, when the BCCYF caseworker met with him in prison, he admitted to using methamphetamines. The record supports the caseworker's testimony that the father "has been entangled with the criminal justice system since the children went into placement."

In our September 26, 2017 Order, we changed the primary goal to adoption, with a concurrent goal of adoption. Neither parent appealed such goal change.

A 26TH Month Status Conference was held December 14, 2017, confirming the primary case goal and concurrent case goal are adoption and that the subject children remained placed in the kinship foster home of A.K. and M.K. The Father, S.A.D. refused to exit his prison cell at SCI-Somerset to participate via phone in the status conference.

During the first TPR Hearing held January 4, 2018, BCCYF presented the testimony of Lesa Ramper, the caseworker who first became involved with the family in October 2016. Due to the Father not being transported for the TPR Hearing, the Agency proceeded only against the Mother. Ms. Ramper testified that since the prior dependency hearing held December 19, 2017, the only contact she had from the Mother was one (1) phone call, despite

13

multiple attempts to reach her. There were no other inquiries from the Mother about the children. [1/4/18 Transcript, p. 9]. Ms. Ramper confirmed that the children still resided with the maternal great aunt, [A.K.] and her husband, [M.K.], and that when she visits the children, they do not talk about anyone else other than Mr. & Mrs. K. [T., p. 10]. The Mother had not provided any evidence that she had followed through with drug and alcohol treatment nor established independent housing. Ms. Ramper also confirmed that Mr. & Mrs. K. are open to continued contact by the parents, so long as such contact is consistent and the parents are sober. [T., p. 15]. Finally, Ms. Ramper testified that there had been some discussion about the Mother voluntarily relinquishing her parental rights, but that she did not want to personally appear at a hearing due to the emotional stress that it would have on her. [T., pp. 17-19].

During the **TPR Hearing** held **January 31, 2018**, when BCCYF proceeded as against the Father, Ms. Ramper testified once again. She indicated that the Father was arrested on May 15, 2017, and that from January, 2017 until the date of his arrest, he had been residing with his Mother, N.D. The home was suitable and adequate. There was a fall-out between the Father and his mother at the time the Emergency Custody Order was granted by the court (on April 10, 2017) for the subject children and N.D. had acquired an eviction notice regarding the Father, who did not return to her residence. [1/31/18 Transcript, pp. 8-9]. Ms. Ramper testified that on January 19, 2017, she had visited the Father "in an attempt to actually close out with this family". He tested positive for methamphetamines and amphetamines, which was

14

sent to the laboratory and confirmed. On February 24, 2017, the Father tested positive again for the same substances, which was confirmed by the laboratory. On March 29, 2017, the Father tested positive for heroin. [T., pp. 9-10]. Ms. Ramper testified that when they returned to N.D.'s residence to secure the safety of the children, N.D. related her concerns regarding the Father's relapse, and advised that he had left the home with the children and she was not aware of his whereabouts. [T., p. 10]. On or about March 7, 2017, the Father had been unsuccessfully discharged from drug and alcohol treatment. Ms. Ramper was not aware of him seeking any treatment through another provider. Further, the Father's phone number had changed and he did not notify the Agency. [T., p. 10]. Ms. Ramper stated that since his incarceration on May 17, 2017, the Father had not initiated any contact with the Agency, nor was she aware of him sending any letters or communicating in any fashion with Mr. & Mrs. K. or the children. [T., p. 11]. The Father had not provided BCCYF any information relative to any treatment or services since his incarceration. [T., p. 12]. Finally, Ms. Ramper reported that it was her understanding that Mr. & Mrs. K. would still allow contact for both parents, as long as they were sober. Mr. & Mrs. K. remain an adoptive resource. [T., p. 12].

Upon cross examination by Father's counsel, Ms. Ramper acknowledged that the Father, at one time, had custody of both children, including custody of G.A.D. from the time of his birth until he was three (3) years old. Per Ms. Ramper, during that time period, the Father was attending drug and alcohol treatment, making progress and was also on a Suboxone maintenance program. [T., pp. 14-15]. Ms. Ramper, testified, however, that after his relapse in January, 2017, subsequent progress reports indicated that he had missed several appointments and that his progress was "poor". [T., p. 16]. When she did observe the Father with his children, he appeared to be patient and attentive. The home arrangement by the Father and his mother, N.D., was "a very natural setting . . . a very comfortable setting.". [T., pp. 18-19]. Ms. Ramper also indicated that the Father had a warm and loving relationship with the children. Her only concern with his parenting was that **G.A.D.** was displaying some behavioral concerns and she had recommended on several occasions that the child should be evaluated for enrollment in a preschool program such as Head-Start or the Pre-K Counts program. The Father "was not interested". [T., p. 19].

16

Upon cross examination by the Guardian Ad Litem, Ms. Ramper admitted that during the Agency's involvement with the Father, that he was always living with his mother up until the time he left, and that it "would be more than fair" to conclude that N.D. helped maintain the home. Ms. Ramper also confirmed that the Agency had never experienced the Father maintaining a household exclusively on his own. [T., pp. 20-21].

The Father, **S.A.D.** also testified during the January 31, 2018 hearing. The Father is an inmate at the SCI-Laurel Highlands and he originally went to jail in May, 2017. He was then released on bail for a period of time, but has now been consistently incarcerated since early July, 2017. [T., pp. 21-22]. During the period of time that he was out on bail, he had one (1) day visit with the children at the home of Mr. & Mrs. K. He also saw them by chance on one occasion in Patton, PA. [T., p. 22]. The Father is 30 years of age and has a high school degree. [T., p. 22].

In early July, 2017, the Father went to jail in Clearfield County and was subsequently transferred to the SCI on November 3, 2017. [T., p. 24]. The Father claims that he has sent his children five (5) letters and two (2) cards, one for Thanksgiving and one for Christmas, during the time that has been incarcerated. [T., p. 25]. Relative to employment, prior to his incarceration, the Father explained that he "had odd and end jobs under the table" [T., p. 28].

17

There is no evidence of record that the Father has maintained consistent or steady employment since inception of the dependency proceedings.

The Father readily admitted that he relapsed while still living with his mother, that he "made a few bad decisions" and decided to move out. He freely acknowledged that his life "fell apart" after the children were removed from his custody. [T., pp. 29-30].

Relative to his most recent criminal history, on October 17, 2017, at Docket No. 541 of 2017 in Clearfield County, the Father received a sentence of 4 months to 3 years for Retail Theft (misdemeanor of the 1st degree) and a 60 day period of incarceration for Driving Under Suspension. At Docket No. 68 of 2017, the Father received concurrent sentences of 6 months to 1 year for Possession of Controlled Substance and Use/Possession of Drug Paraphernalia. In Cambria County, on November 30, 2017 at Docket No. 1320 for 2017, he received a consecutive 6 to 12 month sentence for Possession of Controlled Substance and also pled guilty to a summary Harassment at Docket No. 871 for 2017. Therefore, the aggregate sentence imposed upon the Father was 1 to 4 years in the state correctional system. [Petitioner's Exhibit 1, 1/4/18 TPR Hearing; and 1/31/18 Transcript, pp. 4-6]. The Father confirmed that the aggregate sentence imposed upon him from both the Clearfield County and Cambria County criminal actions is 1 to 4 years and that his minimum date is July 18, 2018. He anticipates being transitioned to a therapeutic community program. Because he has no specific plans for housing, he acknowledged that he will have to go to a half-way house and secure a job and find

18

housing before being released. [T., pp. 30-34]. The Father acknowledged that his length of stay at the half-way house is uncertain. [T., p. 37]. The Father admitted that there is no guarantee that he will be granted parole upon his minimum date of July 18, 2018. If he is denied parole, he said it will be at least another month until parole would be reconsidered. [T., p. 53].

The Father described his relationship with **G.A.D.** as "[a]mazing. My son is my best friend . . . no matter what I was doing, he was always trying to be right there with me trying to help. We were inseparable", and that they "absolutely" have a strong bond. The Father also testified that after he came to learn that he was the biological father of **R.S.** that his relationship "was pretty much the same" and that he, his son and his daughter "were inseparable". The Father stated that "[t]hey are my sidekicks. I would say like I can't function without my kids very well." [T., pp. 35 & 36].

The Father claims that he sent two (2) letters to BCCYF while in prison [T., p. 36], which we do not find to be credible based upon Ms. Ramper's testimony that the Agency never received any correspondence or communication. Relative to his drug addiction, the Father acknowledged that he has struggled with substance abuse since he was a teenager. His drug use predated the birth of his son and that in addition to methamphetamines and heroin, he has tried

19

cocaine a few times. When he was younger, he "used to eat mushrooms here and there". Most recently, he relapsed on both methamphetamines and heroin. In addition to the three (3) failed drug tests referenced above, there were, in his words, "four other times I was high.". [T., pp. 38-42]. The Father also acknowledged that he had a prior conviction in Cambria County in 2011 for DUI: Controlled Substance and Criminal Trespass, which he described as "drug related offenses". He received a county sentence of 11 ½ to 23 months. [T., pp. 47, 54-55]. The Father did acknowledge that relative to the permanency of his children, that time is an important factor for the court's consideration. [T., pp. 56 & 57].

We accept that the Father loves both of his children and has a bond with them. There was a period of time when he had both in his custody, but the evidence establishes that during this time, he resided in his mother's home and they essentially had a shared arrangement of caring for the children. The Father has never had exclusive custody of his children. Whatever bond may exist between the children and their Father is outweighed by their need for safety, stability and permanency.

The Father testified that prior to his incarceration in May, 2017, that he made several attempts to visit the children, but that Mr. & Mrs. K. kept making excuses. [1/31/18 T., pp. 22-23]. Ms. Ramper testified that based upon her contact with Mr. & Mrs. K., she was advised that there had not been any contact by the Father [1/31/18, T., pp. 11 & 17]. We find Ms. Ramper's testimony to be credible. We also would note that the Father admitted that during this time

20

frame, he was actively using illegal drugs. Thus, Mr. & Mrs. K. would have been justified in denying him access to the children for their own safety and well-being.

This court has long recognized that "[a] child's life, happiness and vitality simply cannot be put on hold until the parent finds it convenient to perform parental duties." *In the Matter of the Adoption of A.M.B.*, 812 A.2d 659, 675 (Pa. Super. 2002).

A parent has a duty to work towards reunification with children by cooperating with the rehabilitative services necessary for him or her to be able to perform parental duties and responsibilities. *Matter of Adoption of M.A.B.*, 166 A.3D 434 (Pa. Super. 2017).

Turning to the statutory grounds relative to involuntary termination of parental rights, **23 Pa. C.S.A. §2511(a)(1)** states that the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. At the time of the January 31, 2018 TPR hearing, **R.S.** had been in placement nineteen (19) of the past twenty-seven (27) months. **G.A.D.** had been in placement for almost ten (10) continuous months. The Father freely acknowledges that he has an addiction history dating back to his teenage years. He is now thirty (30) years of age. Despite repeated directives of both the Cambria County Court and this Court, the Father has refused or failed to invest in and successfully complete any recommended drug and alcohol treatment dating back to the August

21

31, 2016 Permanency Review (6th Month) Order entered in Cambria County when it was found that the Father failed to follow through with the D&A recommendation of weekly out-patient counseling. Further, he had failed a drug screen conducted by the adult probation office. At the 14th Month Review hearing, the Father declined to attend I.O.P. as directed in the Order of February 13, 2017, as recommended after a re-evaluation. This was just two (2) months prior to his relapse and admission on April 10, 2017 to actively using methamphetamines, testing positive for heroin and drug paraphernalia being found in his bed room. On such date, BCCYF was granted emergency custody of both children. At such time, the Father left the family residence with the children and the paternal grandmother, N.D., stated that the Father could not effectively deal with his drug abuse and that the children were at risk in his presence. The Father is currently serving an aggregate sentence of 1 to 4 years in the state correctional system, which includes a conviction for Possession of Controlled Substance and Use/Possession of Drug Paraphernalia in Clearfield County; Possession of Controlled Substance and Criminal Trespass in Cambria County. Prior to his incarceration, the Father tested positive for methamphetamines and amphetamines on both January 19, 2017 and February 24, 2017. On or about March 7, 2017, the Father had been unsuccessfully discharged from drug and alcohol treatment. As confirmed in the May 17, 2017 Permanency Review Order, a bench warrant had been issued for the Father's arrest due to his failure to appear for numerous appointments with his parole officer and his failure to comply with the terms of his supervision.

22

During his testimony during the January 31, 2018 hearing, the Father acknowledged that he had a prior conviction in Cambria County, which he described as "drug related offenses", those being DUI: Controlled Substance and Criminal Trespass. Despite a chronic drug addiction history dating over ten (10) years and despite prior criminal convictions as a result of his drug addiction, the Father has never invested and successfully completed any type of drug and alcohol treatment. Even his own mother, with whom he lived for approximately 1 ½ years prior to his incarceration, stated that the children were at risk in his presence because of his drug usage. Contrary to what he raised in his Concise Statement No. 2, none of these factors were beyond the Father's control. It was solely his decision to use illegal and illicit drugs; it was solely his decision to not follow through with recommended drug and alcohol treatment; it was solely his decision to engage in criminal activity; and it was solely his decision not to comply with the terms of his supervision. Thus, we find that BCCYF has met its burden of proof by clear and convincing evidence relative to 23 Pa. C.S.A. §2511(a)(1).

For the same reasons, we find that BCCYF has also met the statutory grounds by the requisite burden of proof under 23 Pa. C.S.A. §2511(a)(2) and (a)(5). The repeated and continued incapacity, abuse, neglect or refusal of the Father to invest in the drug and alcohol treatment that has been consistently recommended and to achieve and maintain sobriety in his life has left the subject children without the essential parental care, control or subsistence necessary for their physical or mental well-being. The repeated incapacity, abuse, neglect or

23

refusal of the Father, as evidenced by his course of conduct over these many years, demonstrates that the causes of his incapacity, abuse, neglect or refusal cannot or will not be remedied by him. Further, both children have been in the continuous custody of the Agency since April 10, 2017, a period of almost ten (10) months as of the date of the January 31, 2018 TPR Hearing. The Father is incarcerated, and there is no evidence that he has even taken the steps to address his addiction issue within the prison system. The Father acknowledged that his minimum date for parole is July 18, 2018, and there is no guarantee that he will paroled on such date. At the time of hearing, the Father did not have any specific plans relative to submission of a home plan, and anticipated that he would eventually be transitioned to a therapeutic community center. The Father confirmed that he will not be released from a half-way house until he has secured a job as well as approved housing. The Father has never demonstrated any ability to consistently maintain steady and verifiable employment. His mother, N.D., with whom he lived prior to incarceration, has indicated to BCCYF that she does not want him to return to her residence. Therefore, based upon the evidence and the history of this case, the Father has not demonstrated that he is likely to, nor even capable of, remedying the conditions which led to removal and placement of the children within a reasonable period of time.

24

As to 23 Pa. C.S.A. §2511(a)(8), the most recent removal of the children was on April 10, 2017. They have been in placement for a period in excess of ten (10) months as of the date of the last TPR Hearing. Considering the fact that the earliest possible date that the Father could be released from incarceration is July 18, 2018 (which cannot be anticipated based upon his current circumstances), the children will have been removed from his care for a period in excess of twelve (12) months by such time.

During the January 4, 2018 TPR hearing, Ms. Ramper described the emotional issues that the child. **G.A.D.** is suffering and stated "that [A.K.] is working with pediatricians and a child psychologist/psychiatrist and neuropsychologist to test and diagnosis what maybe the cause and how to treat **[G.A.D.'s]** symptoms." [1/4/18, T., p. 11]. In response to a question from BCCYF's attorney as to whether Ms. Ramper has found [A.K. & M.K.'s] efforts with **[G.A.D.]** to be appropriate, Ms. Ramper replied:

> "Absolutely. They are very consistent with him. They are very supportive of him. They show him a lot of love and compassion, and they don't - - - they're not harsh with [him] even when he does things that are difficult to manage."

[1/4/18 T., p. 13]

Further, relative to the child, **R.S.**, Ms. Ramper testified:

> "I would say that . . . [**R.S.**] has fully adjusted, and she is thriving in their home. She doesn't have any difficulties with emotional regulation or . . . day-to-day expectations. . . . She interacts, you know, more. She is definitely in my opinion on target completely with her development."

[ 1/4/18 T., pp. 13-14]

During the January 4, 2018 TPR proceeding, the potential adoptive mother, A.K., testified as to how the children were doing within their kinship foster home. A.K. testified as follows:

> "Okay we'll start [with] **R.S.** she's doing awesome. I feel she's totally adaptive to us. Early intervention did discharge her . . . She's right on target. I think she is really advanced for 2 years old. She is doing awesome."

[1/4/18 T., pp. 24 & 25].

Relative to [**G.A.D.**], A.K. described the child's behavioral issues and confirmed that he has undergone testing and that the behavioral issues are being addressed. [1/4/18 T., pp. 25 & 26].

Overall, the children are doing very well in the kinship foster home of their maternal great aunt, [A.K.] and her husband [M.K.]. Mr. and Mrs. K. had a relationship with the children, including overnight visits, prior to any involvement by the Agency. The siblings have been living together in Mr. and Mrs. K.'s home a continued period of time now approaching one (1) year. Therefore, we are satisfied that termination of parental rights best serves the needs and

26

welfare of the children.    We further note that Attorney Willett, who confirmed on-the-record that she was able to represent both the legal and best interests of the children as their GAL [ 1/4/18 T., p. 8  and 1/31/18 T., p. 6], supported the entry of the TPR Decrees.

Based upon the foregoing, we respectfully request your Honorable Superior  Court to affirm the TPR Decrees entered February 1, 2018.

Respectfully submitted,

_____

Honorable Timothy M. Sullivan

Dated: March ____19____, 2018

27